UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 08 C 2410 |
| SENTINEL MANAGEMENT GROUP, INC., ERIC A. BLOOM, and CHARLES K. MOSLEY, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion of Plaintiff Commodity Futures Trading Commission ("CFTC") for partial reconsideration of our March 30th, 2012 judgment denying the CFTC's motion for summary judgment against Eric A. Bloom ("Bloom") and Charles K. Mosley ("Mosley") (collectively, "Defendants"), and granting Defendants' cross-motion for summary judgment. For the following reasons, Plaintiff's motion is denied in part and granted in part.

## BACKGROUND

On March 30th, 2012, we issued a Memorandum Opinion ("March 30th Opinion") denying the CFTC's motion for summary judgment and granting Defendants' cross-motion for summary judgment. *CFTC v. Sentinel Mgmt. Group, Inc.*, 08 C 2410,

2012 U.S. Dist. LEXIS 46198 (N.D. Ill. Mar. 30, 2012). We held that Defendants, as a matter of law, did not violate Sections 4b(a)(2), 4d(a)(2), 4d(b), 4g(a), and 6(c) of the Commodity Exchange Act ("CEA"). 7 U.S.C. §§ 6b(a)(2), 6d(a)(2), 6d(b), 6g(a), and 9. The CFTC now requests that we reconsider our ruling with respect to Section 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Section 4d(b), 7 U.S.C. § 6d(b). We briefly recite the facts relevant to the instant motion.

Sentinel Management Group ("Sentinel") was an investment group registered as both an "investment advisor" with the United States Securities and Exchange Commission ("SEC"), and as a "futures commission merchant" ("FCM") with the CFTC. Bloom was Sentinel's president and chief executive officer for nearly twenty years, controlling the company's day-to-day operations. He also served as Sentinel's chief compliance officer from January 2006 through August 2007. Mosley served as Sentinel's vice president, head trader, and portfolio manager for approximately five years.

Sentinel's business strategy relied on recruiting FCMs to invest their excess margin funds with Sentinel. CFTC regulations allow FCMs to deposit their customers' excess margin funds only with banks, clearing houses, or other FCMs. Sentinel sought the CFTC's advice on how to legally accept and invest FCMs' funds. The CFTC recommended that Sentinel register as an FCM pursuant to 17 C.F.R. § 1.49(d)(2),

which Sentinel did. Soon after Sentinel's registration, the CFTC issued Sentinel a "No Action Letter," whereby exempting Sentinel from the net capital requirements otherwise applicable to FCMs, provided that Sentinel abstained from trading commodities. Sentinel represented that its registration as an FCM was "solely so that it may hold customer's funds deposited with it by other FCMs for the exclusive purpose of investing such funds."

Sentinel held the assets of its client portfolios in segregated custodial accounts with the Bank of New York Mellon Corporation ("BONY"). It also maintained a House Portfolio with BONY, which Sentinel held for its own proprietary trading. BONY maintained these accounts and provided Sentinel with financing through nightly overnight loans. BONY required Sentinel to maintain enough securities in its clearing accounts on a daily basis to collateralize the loan. Crystal York ("York"), Sentinel's employee primarily responsible for booking the loan each night, testified that she indiscriminately chose which securities to pledge as collateral with no consideration for how Sentinel allocated the BONY loan among the portfolios. York testified that she generally used the highest valued securities, which most often were funds belonging to Sentinel's FCM-clients. In the summer of 2007, Bloom instructed Sentinel employees to collateralize the BONY loan with Sentinel's FCM-clients' excess margin funds only if other securities were insufficient.

In 2004, the CFTC allowed for FCMs to use reverse repurchase agreements ("reverse repos") as a form of leverage. *See* 17 C.F.R. § 1.25. On Bloom's recommendation, Sentinel began using reverse repos, whereby it would sell securities to a broker at an amount that was below-market value with a commitment to repurchase that security at a pre-determined higher price. Sentinel profited through these arrangements if the securities' value at the time of repurchase exceeded the difference between the sale price and the repurchase price.

Sentinel's troubles began in June 2007, when a broker who held over $1 billion in outstanding reverse repos with Sentinel began to redeem them. The following month, another broker with $600 million in outstanding reverse repos followed suit. At first, Sentinel paid these brokers with money obtained from the nightly BONY loans. By August 13th, 2007, Sentinel lacked the capital to meet its clients' redemption orders. BONY sent Bloom a letter on August 17th notifying him that Sentinel had defaulted on the loan agreement, and that it had the right to sell the securities that Sentinel had pledged as collateral. Sentinel filed for Chapter 11 bankruptcy the same day.

On April 28th, 2008, the CFTC filed a complaint alleging that Bloom, Mosley, and Sentinel violated various sections of the Commodities Exchange Act ("CEA").[1] On March 30th, 2012, we denied the CFTC's summary judgment motion and granted

---

[1] On August 3d, 2009, Sentinel consented to judgment as part of a settlement agreement with the CFTC.

- 4 -

Defendants' cross-motion for summary judgment in its entirety. The CFTC filed the instant motion on April 26th, requesting that we revisit our ruling.

## LEGAL STANDARD

Rule 59(e) allows for a litigant to file a motion to alter or amend a judgment within 28 days after the entry of judgment. Fed. R. Civ. P. 59(e). To prevail on such a motion, the moving party must present either newly discovered evidence or establish that judgment was the result of a manifest error of law or fact. *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). A "manifest error" is the wholesale disregard, misapplication, or failure to recognize controlling precedent. *Id.* Any errors of law or fact must be clearly established by the moving party. *Sigsworth v. City of Aurora*, 487 F.3d 506, 512 (7th Cir. 2007). The decision to grant or deny a Rule 59(e) motion lies within the sound discretion of the Court. *In re of Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

## DISCUSSION

I.      **Section 4b(a)(2)**

In its complaint, the CFTC alleged that Defendants violated Section 4b(a)(2) of the CEA, 7 U.S.C. § 6b(a)(2), by misappropriating investors' assets for use as collateral on the BONY loan. Section 4b(a)(2) prohibits fraud "in connection with" any futures contract. Using identical language in Section 10(b) of the Securities Exchange Act

("Section 10(b)") to guide our analysis, we held that no nexus existed between any alleged fraud by Sentinel and any futures contract order. *Sentinel Mgmt.*, 2012 U.S. Dist. LEXIS 46198, at *13-16. Sentinel's only connection with futures contracts was that its FCM-clients traded futures. *Id.* at *14-15. We found this connection too remote for Section 4b liability to attach to Sentinel. *Id.*

The CFTC now contends that our ruling was a manifest error of law. Specifically, the CFTC argues that Sentinel's investment of its FCM-clients' margin funds was "in connection with" futures transactions because (1) Defendants knew that its FCM-clients had deposited their customers' margin funds with Sentinel for investment; (2) Sentinel promised its FCM-clients that it would meet their redemption requests for their customers' margin funds on a same day basis; and (3) Sentinel maintained multiple customer segregated accounts with BONY and JP Morgan Chase Bank, which it accepted subject to the CEA. However, these facts were considered by the Court in the March 30th Opinion, and they do not alter our ruling that a sufficient connection between Sentinel's allegedly fraudulent conduct and the trading of futures contracts was lacking.

Furthermore, the case law that CFTC cites does not demonstrate that we misapplied the law. The CFTC relies on *In re R&W Technical Svcs.*, 205 F.3d 165 (5th Cir. 2000), and *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986), for the

proposition that a violation of Section 4b(a) may be found even where futures trading has not yet occurred, where defendants are not involved in the sale or purchase of the futures contracts, or if misrepresentations were made about the quality of the source of the trading decisions. These cases are readily distinguishable. Unlike the defendants in *R&W* and *Saxe*, Sentinel made no misrepresentations that induced customers to enter into futures trading contracts. It therefore is not liable under Section 4b.[2]

Because the CFTC is unable to demonstrate that we have committed any manifest error of law, we deny its motion to amend judgment with respect to Section 4b(a)(2).

## II.    Section 4d(b)

Next the CFTC asks us to reconsider our ruling with respect to Section 4d(b) of the CEA. The CFTC asserts that Sentinel violated Section 4d(b) because it allegedly removed securities from its FCM-clients' segregated accounts and placed them in lienable clearing accounts, where they were commingled with Sentinel's proprietary securities and improperly pledged as collateral for the BONY loan for the benefit of the House Portfolio. CFTC contends that our ruling was in error because Section 4d(b) protects FCMs' customer funds from commingling and misappropriation by third parties like Sentinel.

---

[2]   CFTC also cites to *SEC v. Dibella*, No. Civ. 304CV1342EBB, 2005 WL 3215899 (D. Conn. Nov. 29, 2005), which addresses the "in connection to" language of Section 10(b). In *Dibella*, the defendant allegedly induced a third party to engage in a securities transaction. Sentinel did not cause any futures contracts to be purchased or sold. *Dibella* is therefore distinguishable.

### A. Our Ruling Granting Defendants' Cross-Motion for Summary Judgment

In the March 30th Opinion, we held that Sentinel could not be liable under Section 4d(b) because it did not receive customer funds as described in Section 4d(a)(2). *Sentinel Mgmt.*, 2012 U.S. Dist. LEXIS 46198, at *21-22. But as CFTC now points out, our ruling misinterpreted the scope of Section 4d(b), as made evident by the text and the purpose of the statute.

Section 4d(a)(2) funds, or "customer funds," are money, securities, or property that an FCM receives from its customers in order to margin, guarantee, or secure the trades or contracts of these customers. 7 U.S.C. 6d(a)(2). The CEA imposes strict segregation requirements on these funds. *Id.* A Section 4d(b) violation occurs when a person who receives Section 4d(a)(2) funds treats those funds as if they belonged to anyone other than the FCM's customer. 7 U.S.C. § 6d(b). It is undisputed that Sentinel's FCM-clients held Section 4d(a)(2) funds, that the FCM-clients invested those funds with Sentinel, and that Sentinel held those funds in its own segregated accounts at BONY. In the March 30th Opinion, we ruled that because FCMs' handling of its customers' funds were the target of Section 4d(a)'s regulation, only FCMs could be held liable under Section 4d(b).

The rationale underlying our ruling is belied by a more natural reading of the statute and the purpose behind the statute. The scope of Section 4d(b) plainly

- 8 -

encompasses persons beyond FCMs. Section 4d(b) is entitled "Duties of clearing agencies, depositories, and others in handling customer receipts." 7 U.S.C. § 6d(b). Additionally, the statute and corresponding regulations state that liability may extend to "any person." *Id.*; *see* 7 U.S.C. § 1a(38). Furthermore, Sentinel legally held and invested its FCMs' clients' funds with the CFTC's consent. Section 4d(b)'s non-exhaustive list of the types of entities that could legally hold FCMs' customers' funds indicates that Congress intended to hold entities like Sentinel liable in the event they misappropriated or commingled any of the FCMs' customers' funds. Interpreting Section 4d(b) to reach non-FCMs is consistent with an administrative action in which the CFTC's adjudicatory arm found that a non-FCM depository was liable under Section 4d(b) for using its FCM-client's customer funds to extend credit to the FCM-client. *See In re JP Morgan Chase Bank, N.A.*, Comm. Fut. L. Rep. [Current Transfer Binder] (CCH) ¶ 32, 156 (CFTC Apr. 4, 2012).

Moreover, accepting Defendants' argument that we ruled correctly the first time would require us to construe Section 4d(b) as a shield to liability for non-FCMs who legally accept FCMs' customers' funds but then commingle or misappropriate those funds. Such a reading is contrary to the purpose of the statute: protecting investors' funds and limiting the impact of serious market disruptions. *See Financial and Segregation Interpretation No. 9, Money Market Deposit Accounts and Now Accounts*

("[I]t has always been the Division's position that customer funds deposited in a bank cannot be restricted in any way, that such funds must be held for the benefit of customers and must be available to the customer and the FCM immediately upon demand."); *Financial and Segregation Interpretation No. 10, Treatment of Funds Deposited in Safekeeping Accounts* (when there is a market disruption, any impediment or restriction on the ability to immediately withdraw funds "could magnify the impact of any market disruption and cause additional repercussions."). Because the statute favors protecting investors' liquidity over providing a safe harbor for non-FCMs that misappropriate Section 4d(a)(2) funds, the CFTC's argument is persuasive.

As is demonstrated by the language of Section 4d(b) and its underlying purpose, Sentinel was required to comply with Section 4d(b). We hold that granting Defendants' cross-motion for summary judgment on these grounds was in error and reverse our holding to the extent it relied on that rationale.

Although we grant the CFTC's motion, our inquiry does not end here. In the March 30th Opinion, we determined that Section 4d(b) was inapplicable to Defendants, and therefore had no occasion to consider whether either party was entitled to summary judgment based on the factual matter underlying the alleged violations of Section 4d(b). We now consider the parties' respective motions for summary judgment.

### B.    CFTC's and Defendants' Cross-Motions for Summary Judgment

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). When faced with cross-motions for summary judgment, the court views all facts, and draws all reasonable inferences in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

### 1.    Bloom's and CFTC's Motions for Summary Judgment

The CFTC alleges that Bloom is liable under Section 4d(b) as a "controlling person" of Sentinel. 7 U.S.C. § 13c(b). Under Section 13(b) of the CEA, a person is liable if he directly or indirectly controls any person who has violated the CEA. *Id.* The CFTC has the additional burden of proving that Bloom lacked good faith to prevail in its motion. *CFTC v. Monieson*, 996 F.2d 852, 858 (7th Cir. 1993). A controlling person acts in bad faith if he does not maintain a reasonably adequate system of internal supervision and control over an employee or did not enforce the system with reasonable diligence. *Id.* at 860.

Bloom maintains that he acted in good faith, and that he is entitled to summary judgment as a result. Bloom claims that he lacked knowledge of any impropriety relating to the Section 4d(a)(2) funds, and that his knowledge was based on audits conducted by Sentinel's independent auditors and the National Futures Association, a regulatory organization for the futures industry. But the auditors' failure to discover any of Sentinel's alleged improprieties does not establish that Bloom lacked knowledge that they existed. As Sentinel's CEO, it is reasonable to infer that Bloom acquired knowledge of Sentinel's from a number of internal company sources. The audits therefore do not establish Bloom's good faith.

Additionally, the evidence suggests, though tenuously, that Bloom had knowledge of the alleged misconduct. On at least one occasion, Bloom learned that York had improperly been using assets from a client portfolio as collateral for the loan when the portfolio had not been allocated any portion of the loan. While Bloom instructed York not to do so in the future, this admonition alone is insufficient to establish his good faith during the two years in which the CFTC alleges that the misconduct occurred.

Bloom has not met his burden of establishing that he did not knowingly or recklessly allow for investors' securities to collateralize the House Portfolio. Because a genuine issue of material fact exists as to Bloom's state of mind, the CFTC's and Bloom's respective motions for summary judgment are denied.

## 2.    Mosley's and CFTC's Motions for Summary Judgment

The CFTC alleges that Mosley is liable under Section 4d(b) for aiding and abetting Sentinel by drawing upon the overnight BONY loan to benefit the House Portfolio.  Under Section 13(a) of the CEA, a person who willfully aids and abets someone in an unlawful venture is liable as a principal.  7 U.S.C. § 13c(a); *Brenner v. CFTC*, 338 F.3d 173, 716 n.3 (7th Cir. 2003).  Liability for aiding and abetting under the CEA requires knowledge of the principal's objective and a desire to attain that objective.  *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987); *citing In re Richardson Sec., Inc.*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21, 145 (CFTC Jan. 27, 1981).

The CFTC argues that Mosley is liable under Section 13(a) because he was in charge of Sentinel's customer and House portfolios, and that he therefore possessed the requisite knowledge and desire to further the illegal scheme.  But while Mosley's authority within Sentinel may lead to an inference of his knowledge and desire to further Sentinel's goal of misusing its clients' assets, the CFTC's failure to demonstrate Mosley's actual knowledge with respect to the transactions is fatal to its motion.

On the other hand, Mosley's cross-motion for summary judgment fails to put forth any evidence that he affirmatively lacked knowledge of Sentinel's alleged misappropriation of its clients' assets.  Instead he baldly asserts that he did not control,

maintain, or otherwise service the BONY loan. Even if Mosley supported his contention, he would fail to establish that he lacked the knowledge of the allegedly improper use of the BONY loan, or that he lacked the authority to right the ship. Furthermore, the nature of Mosley's position casts doubt on his claim that he was unaware that the securities in the House Portfolio were insufficient to collateralize the BONY loan. Because a genuine issue of material fact exists with respect to Mosley's mental state, the CFTC's and Mosley's respective motions for summary judgment are denied.

## CONCLUSION

For the aforementioned reasons, we deny the CFTC's motion to alter or amend the judgment granting Defendants' cross-motion for summary judgment with respect to Section 4b(a)(2), and grant its motion to alter or amend granting Defendants' cross-motion for summary judgment with respect to Section 4d(b).

_____
Charles P. Kocoras
United States District Judge

Dated:   August 6, 2012